FILED
MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS
02/24/2023 10:39 AM
CV 2023 02 0367

## IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO

| | |
|---|---|
| CHERI JACKSON<br>501 15th Ave.<br>Middletown, OH 45044 | ) CASE NO.<br>)<br>) JUDGE:<br>) |
| Plaintiff, | )<br>) |
| v. | ) **COMPLAINT FOR DAMAGES AND**<br>) **INJUNCTIVE RELIEF**<br>) |
| TRANSWORLD DELIVERY<br>CORPORATION<br>9309 Cincinnati Dayton Rd.<br>West Chester Township, OH 45069 | ) **(JURY DEMAND ENDORSED**<br>) **HEREIN)**<br>)<br>) |
| **Serve also:**<br>TRANSWORLD DELIVERY<br>CORPORATION c/o Dinsmore<br>Agent Co. (Stat. Agent)<br>255 E. Fifth St., Ste. 1900<br>Cincinnati, OH 45202 | )<br>)<br>)<br>)<br>)<br>) |
| **-and-** | )<br>) |
| CHRISTA COLLETT, HUMAN<br>RESOURCES c/o TRANSWORLD<br>DELIVERY CORPORATION<br>9309 Cincinnati Dayton Rd.<br>West Chester Township, OH 45069 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

Plaintiff Cheri Jackson, by and through undersigned counsel, as her Complaint against the

Defendants, states and avers the following:

## PARTIES

1. Jackson is a resident of the city of Middletown, Butler County, Ohio.

2. Defendant INTRANSWORLD DELIVERY CORPORATION ("Transworld") is a domestic

    corporation for profit that conducts business throughout the state of Ohio.

**EXHIBIT A**

3. Transworld is, and was at all times hereinafter mentioned, Jackson's employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §2000e, *et seq.* and Ohio R.C. §4112, *et seq.*

4. Upon information and belief, Defendant CHRISTA COLLETT is a resident of the state of Ohio.

5. Defendant Collett is and/or was an employee of Transworld.

6. Defendant Collett did, and at all times hereinafter mentioned, acted directly or indirectly in the interest of Transworld and/or within the scope of his employment at Transworld.

7. At all relevant times referenced herein, Defendant Collett supervised and/or controlled Jackson's employment at Transworld.

8. Within 300 days of the adverse employment actions described herein, Anders dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Ohio Civil Rights Commission ("OCRC") against Transworld, Charge No. 473-2022-01033 ("EEOC Charge").

9. On or about November 30, 2022, the EEOC issued and mailed a Notice of Right to Sue letter to Jackson regarding her EEOC Charge.

10. Jackson received the Notice of Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 200e-5(f)(1), which had been attached hereto as Plaintiff's Exhibit 1.

11. Jackson has filed this Complaint on or before the 90-day deadline set forth in the Notice of Right to Sue letter.

## JURISDICTION & VENUE

12. All of the material events alleged in this Complaint occurred in or around Butler County, Ohio.

2

**EXHIBIT A**

13. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. § 2307.382(A)(1), (2), and/or (3).

14. Venue is proper pursuant to Civ. R. 3(C)(1), (3), and/or (6).

15. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

16. Jackson is a former employee of Transworld.

17. At all times noted herein, Jackson was qualified for her position with Transworld.

18. At all times noted herein, Jackson could fully perform the essential functions of her job, with or without a reasonable accommodation.

19. Jackson worked for Transworld as a delivery driver from November 4, 2021, until Transworld unlawfully constructively terminated her employment on or about February 8, 2022.

20. Jackson is a woman, placing her in a protected class for her sex/gender.

21. Jackson initially joined Transworld after an interview with HR manager Defendant Collett (Female).

22. After a few days of training and orientation, as well as a ride along with then-driver, current dispatcher Steve LNU (Male), Jackson began running her own routes.

23. Into early December 2021, Jackson's employment experience at Transworld was overall positive.

24. On or about December 16, 2021, Jackson had driver training regarding box trucks.

25. Collett informed Jackson that she did not need to wear her normal uniform because it was a training day, so Jackson wore street clothes and her uniform vest.

3

26. Jackson was sent to train with trainer Stephanie LNU (Female), who had Jackson watch the relevant videos and take the required tests.

27. Jackson passed both tests without issue and returned to help complete loadout for the day.

28. After completing the loadout, Jackson continued to work with drivers Jasmine LNU (Female) and Sherry Vultaggio (Female), as well as dispatcher Torey LNU (Male), and another person whose name she could not recall.

29. The group worked in problem solving together until Transworld had Jackson take the box truck on a route.

30. Jackson loaded up with Jasmine LNU and Vultaggio.

31. As Jackson was approaching the truck, she saw driver Don Davis (Male), whom she had never met before. Jackson did not know who Davis was at the time, and learned his name later.

32. After Jasmine LNU and Vultaggio left for other work, Jackson began to climb into the back of the truck to complete the loadout.

33. As Jackson was climbing, Davis grabbed her buttocks and moaned.

34. Shocked, upset, and not sure how to respond, Jackson froze.

35. Torey LNU then came by and grabbed Davis for another task.

36. Jackson stayed frozen for a few more moments, then eventually drove the route.

37. After Jackson returned, Torey LNU and Jasmine LNU both made comments that Jackson looked "off." Jackson did not yet report the assault.

38. Shortly after, Jackson received a message from Davis saying, "Oh behave Ms. Jackson."

39. This was further sexual harassment from Davis, but Jackson did not recognize the name sending the message until she saw his picture on CrewApp.

4

EXHIBIT A

40. Davis followed that message by sending a picture message of a bag to Jackson.

41. Jackson did not understand what the picture was or what the message meant.

42. Davis sent Jackson a message the following morning at the start of her shift as well.

43. On or about December 18, 2022, Jackson entered the main station at Transworld.

44. Drivers rarely did this, but Jackson took this route in an attempt to avoid Davis.

45. Jackson then drove to the pod where she usually worked and parked in a distant, hidden spot hoping to continue avoiding Davis.

46. Somehow, Davis found out where Jackson parked, quickly came up to her car, and began tapping on her window.

47. Davis began thrusting his pelvis towards her car window and said something that Jackson could not hear. This was further sexual harassment from Davis.

48. Jackson ignored him and began her route for the day.

49. Throughout her route, Davis continued to send Jackson multiple message and pictures via CrewApp.

50. Jackson did not respond to these messages.

51. After Jackson returned from her route, she approached supervisor Bobbi LNU (Female) and reported Davis's sexual assault. This was a protected complaint of sexual harassment.

52. Jackson also reported that Davis was continuing to harass her via CrewApp by using the app to find her car whenever she parked in a covert spot.

53. As Jackson and Bobbi LNU spoke, Davis and driver Michael Buchhee (Male) approached.

54. Davis pulled Jackson away and told her that he would "get some meat, and not that type of meat."

5

55. Jackson did not want to be touched any further by Davis, and walked over to the food that Amazon had given to Transworld employees.

56. Davis got in line and asked Jackson where the beef was.

57. As the meat was labeled and literally right in front of them, Jackson pointed to it.

58. Davis said he did not mean that type of beef, and began shimmying his hips in another act of sexual harassment.

59. Jackson withdrew from the situation and avoided Davis for the rest of the day.

60. On or about December 20, 2021, Collett called Jackson.

61. Collett apologized and said Davis had "lost his mind."

62. Collett promised Jackson that she would never have to deal with him again, and that his employment would be terminated for the sexual assault.

63. Bobbi LNU told Jackson the same thing by phone the next day.

64. On or about December 22, 2021, Bobbi LNU approached Jackson about the day's work.

65. Jackson was listening when she noticed Davis standing in the background. She ignored him and drove her route.

66. Unfortunately, Davis continued to send Jackson messages via CrewApp throughout the day.

67. When Jackson returned to the terminal, she called Bobbi LNU and informed her that she would be resigning.

68. Jackson refused to ever work with or be near Davis again.

69. Bobbi LNU denied knowing that Davis was still at work, as she evidently thought she fired him. Jackson doubted this statement.

EXHIBIT A

70. Bobbi LNU said she would speak further with Collett and begged Jackson not to quit just yet.

71. Collett called Jackson shortly after and asked what was wrong with her.

72. Jackson was surprised by the cavalier call, but demanded to know why Davis still had his job.

73. Collett said Davis would not be fired, as he claimed the grab was "accidental," just as his touch of driver Joy Helton (Female) was.

74. Collett said that because Davis had denied the assault, he would receive no further punishment.

75. Jackson demanded to know why she was not told this before she came into work that day and why she was not at least separated from him during work.

76. Jackson felt unsafe working with Davis after the sexual harassment incidents.

77. Collett accused Jackson of being "dramatic," but said she would see what she could do.

78. Jackson hung up the phone, understandably upset.

79. On or about December 27, 2021, Collett showed up to Jackson's job site.

80. Collett approached Jackson from behind and touched her rear to get her attention.

81. Jackson quickly spun around with her fists raised, assuming that it was Davis sexually assaulting her again.

82. However, she realized it was Collett, a human resources employee, sexually harassing Jackson to get her attention right after Jackson had made complaints of sexual assault from another employee.

83. Collett said she was there to deactivate Davis's badge and mentioned that Transworld had terminated his employment.

EXHIBIT A

84. In January 2022, Jackson's children caught COVID-19.

85. Jackson gave notice of the illness to Transworld and tried to quarantine to keep safe.

86. Instead of following the public policy against the spread of COVID and keeping their employees safe, Transworld had Jackson work pending her test results.

87. Although Jackson ultimately tested negative for COVID, this was clearly a violation of public policy.

88. On or about January 28, 2022, Bobbi LNU informed Jackson that Collett was upset with Jackson for making her terminate Davis's employment.

89. Collett now apparently had some vendetta against Jackson, and Bobbi LNU said that Collett was looking to "dig up dirt" on her.

90. Bobbi LNU then showed some messages to Jackson that she had received from Collett confirming the accusation.

91. Through January 2022, Jackson continued to speak with Collett about her promised sign-on bonus.

92. Collett said the bonus would come through Amazon and not through Transworld.

93. After much more back and forth on this issue throughout the month, Jackson was never paid her sign-on bonus.

94. The final conversation about this bonus occurred on or about February 3, 2022, and no progress was made.

95. These conversations constituted protected wage complaints against Transworld.

96. Only Jackson, the person who had reported sexual assault from both Davis and Collett, was prevented from receiving her sign-on bonus.

8

97. In early February, Collett and Transworld part-owner Phillip Ngundam (Male) called Jackson into a Teams meeting.

98. Collett accused Jackson of using vulgar and sexual language in the workplace.

99. Jackson rightfully denied this, and mentioned she had been told that Collett was trying to get rid of her in retaliation for Jackson's protected complaints.

100. Jackson asked for more specifics on the allegations against her, and Ngundam only gave a bit more information about a rainbow and Bobbi LNU saying something about her husband having a "fat dick."

101. Jackson demanded to know more about the accusation against her, but was given no further information.

102. On or about February 8, 2022, Jackson resigned her employment, citing the sexual harassment and assaults she experienced, as well as the retaliation that occurred in response to her protected complaints.

103. This constructive termination of Jackson's employment constituted an adverse employment action.

104. The above facts demonstrate that Transworld engaged in a pattern and practice of sex/gender discrimination and sexual harassment.

105. There was a causal connection between Jackson's sex/gender and Transworld's constructive termination of Jackson's employment.

106. There was a causal connection between Jackson's sex/gender and Defendant's constructive termination of Jackson's employment.

107. Transworld actually forced Jackson' resignation in an act of discrimination and retaliation.

9

EXHIBIT A

108. As a result of the above, Jackson has suffered and will continue to suffer damages.

## COUNT I: GENDER DISCRIMINATION UNDER R.C. 4112.01 *et seq.*
### (Defendant Transworld Only)

109. Jackson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

110. Jackson is a member of a statutorily protected class based on her gender under R.C. § 4112.02.

111. Transworld treated Jackson differently than other similarly situated employees based on her gender.

112. Transworld discriminated against Jackson on the basis of her gender throughout her employment with the company.

113. Numerous Transworld employees sexually harassed Jackson and made comments about her body, as well as sexually assaulting her.

114. When Jackson attempted to report this behavior, she was told to stop being dramatic and to try working with her assaulters.

115. Male employees were not treated in this manner.

116. On or about February 8, 2022, Transworld constructively terminated Jackson without just cause.

117. Alternatively, Defendant's cited reason for the constructive termination of Jackson' employment was pretext.

118. Defendant terminated Jackson's employment based on her gender.

119. Defendant's discrimination against Jackson based on her gender violates R.C. § 4112.01 *et seq.*

10

EXHIBIT A

120. Jackson suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

121. As a direct and proximate result of Defendant's conduct, Jackson suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT II: GENDER DISCRIMINATION UNDER TITLE VII
### (Defendant Transworld Only)

122. Jackson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

123. Jackson is a member of a statutorily protected class based on her gender under Title VII.

124. Transworld treated Jackson differently than other similarly situated employees based on her gender.

125. Transworld discriminated against Jackson on the basis of her gender throughout her employment with the company.

126. Numerous Transworld employees sexually harassed Jackson and made comments about her body, as well as sexually assaulting her.

127. When Jackson attempted to report this behavior, she was told to stop being dramatic and to try working with her assaulters.

128. Male employees were not treated in this manner.

129. On or about February 8, 2022, Transworld constructively terminated Jackson without just cause.

130. Alternatively, Defendant's cited reason for the constructive termination of Jackson' employment was pretext.

131. Defendant terminated Jackson' employment based on her gender.

11

132. Defendant's discrimination against Jackson based on her gender violates Title VII.

133. Jackson suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to Title VII.

134. As a direct and proximate result of Defendant's conduct, Jackson suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT III: SEXUAL HARASSMENT
### (Defendant Transworld Only)

135. Jackson restates each and every paragraph of this Complaint as though it were fully restated herein.

136. Jackson was subjected to unwelcomed sexual harassment in the form of sexual comments, inappropriate sexual gestures, and sexual advances.

137. Defendant created and sustained an environment of severe and pervasive sexual harassment in the form of unwelcomed sexual comments, inappropriate sexual gestures, and sexual advances.

138. As a direct and proximate result of the intimidating, offensive and hostile environment created and sustained by Defendant, Jackson repeatedly reported the sexual harassment to her supervisor.

139. Defendant's actions amount to discrimination on the basis of sex through the creation of a hostile work environment in violation of R.C. § 4112.02(A) and Title VII.

140. Collett's sexual harassment of Jackson occurred while she was acting in the course and scope of her employment as human resources manager.

141. Collett had knowledge of Jackson's sexual harassment and failed to take any corrective or remedial action.

142. Collett further sexually harassed Jackson after receiving protected complaints of sexual harassment and sexual assault from Jackson.

143. Jackson suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to Title VII and R.C. § 4112.01 *et seq*.

144. As a direct and proximate result of Defendant's conduct, Jackson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**<u>COUNT IV: RETALIATION</u>**

145. Jackson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

146. During her employment with Transworld, Jackson made numerous reports and complaints regarding the sexual harassment and sexual assault she experienced at the hands of her coworkers and supervisors.

147. These were protected complaints.

148. Jackson was assured that Transworld would take action with her sexual assaulter and terminate his employment.

149. Instead, Transworld did nothing and brought unfounded allegations of inappropriate and vulgar behavior against Jackson.

150. The temporal proximity between Jackson's complaints, the introduction of false allegations, and the constructive termination of her employment shows that Jackson was actually fired in retaliation for making these protected complaints.

151. Defendant's actions were retaliatory in nature based on Jackson's complaints of sexual harassment and sexual assault.

13

EXHIBIT A

152. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Jackson, she suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**COUNT V: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

153. Jackson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

154. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating an employee to avoid a Workers' Compensation claim.

155. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law.

156. A clear public policy exists and is manifested in R.C. § 4101.11 stating that "[e]very employer shall furnish employment which is safe for the employees engaged therein," and "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe…"

157. The Ohio Supreme Court recognized that Ohio allows an individual to seek a public policy claim if she is terminated in retaliation for reporting to her employer that she is forced to work in an unsafe work environment. *Greeley v. Miami Valley Maintenance Contrs., Inc.*, (1990), 49 Ohio St.3d 228. *See also Pytlinski v. Brocar Products, Inc.*, 94 Ohio St.3d 77 (Ohio 2011); *Jenkins v. Cent. Transp., Inc.*, No. 09CV525, 2010 WL 420027 (N.D. Ohio Jan. 29, 2010).

EXHIBIT A

158. A clear public policy exists and is manifested in Ohio statutes, and/or administrative regulations, or in the common law, against terminating an employee based on his complaints of dangerous, unsafe, or illegal activity.

159. In January 2022, Jackson's children tested positive for COVID-19.

160. Jackson gave proper notice of this diagnosis to Transworld and attempted to diagnose in order to keep her coworkers safe.

161. Instead of following public policy, Transworld ordered Jackson to work pending her test results.

162. Although Jackson ultimately tested negative for COVID-19, this act was a clear violation of public policy and COVID-19 protocol.

163. Defendant's termination of Jackson jeopardizes these public policies.

164. Defendant's termination of Jackson was motivated by conduct related to these public policies.

165. Defendant had no overriding business justification for terminating Jackson.

166. As a direct and proximate result of Defendant's conduct, Jackson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages

### COUNT VI: UNLAWFUL AIDING, ABETTING, AND INCITING OF DISCRIMINATION
### (Defendant Collett Only)

167. Jackson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

168. Pursuant to R.C. § 4112.02(J), it is unlawful "[f] or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice..."

15

169. Collett aided, abetted, incited, coerced, and/or compelled Transworld's discriminatory termination of Jackson

170. Collett aided, abetted, incited, coerced, and/or compelled Transworld's discriminatory treatment of Jackson

171. As human resources manager, Collett was a trusted supervisor for Jackson.

172. Jackson made numerous reports of experiencing sexual harassment and sexual assault by other Transworld employees.

173. Collett responded to these protected complaints by sexually harassing Jackson and further making her feel unsafe at Transworld.

174. Collett violated R.C. § 4112.02(J) and § 4112.99 by aiding, abetting and inciting discrimination.

175. Jackson suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq.*

176. As a direct and proximate result of Defendant's conduct, Jackson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Jackson demands from Defendant the following:

a) Issue a permanent injunction:

   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

16

EXHIBIT A

      iii.   Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

      iv.   Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

      v.   Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Jackson for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Jackson's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

**EXHIBIT A**

Respectfully submitted,

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
  Trial Attorney
Evan R. McFarland (0096953)
**SPITZ, THE EMPLOYEES' LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244
Fax: (216) 291-5744
Email: matthew.bruce@spitzlawfirm.com
Email: evan.mcfarland@spitzlawfirm.com

*Attorneys for Plaintiff Cheri Jackson*

## JURY DEMAND

Plaintiff Cheri Jackson demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
  Trial Attorney
**SPITZ, THE EMPLOYEES' LAW FIRM**

18

**EXHIBIT A**